**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **STRECK, INC., a Nebraska corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **8:06CV458** |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **RESEARCH & DIAGNOSTIC SYSTEMS, INC., a Minnesota corporation, and TECHNE CORPORATION, a Minnesota corporation,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the court on several motions filed by the parties related to expert witnesses and discovery under the protective order. Each of the motions are fully briefed and will be discussed, in turn, below.

**BACKGROUND**

This is an action for patent infringement. Streck, Inc. (Streck) asserts that Research & Diagnostic Systems, Inc. (R&D Systems) and Techne Corporation (Techne) have infringed three of Streck's patents for hematology control technology: (1) U.S. Patent No. 6,200,500 B1 ('500 patent) issued on March 31, 2001; (2) U.S. Patent No. 6,221,668 B1 ('688 patent) issued on April 24, 2001; and (3) U.S. Patent No. 6,399,388 B1 ('388 patent) issued on June 4, 2002 (collectively, the patents-in-suit). **See** Filing No. 1 - Complaint. Streck states "[h]ematology controls are used to assist in the calibration, operation and accumulation of quality control data for automated blood cell counting instruments." ***Id.*** ¶ 6. Streck also alleges that "[h]ematology controls containing a number of different blood components are sometimes referred to in the industry as 'complete' or 'integrated' controls. Streck makes and sells integrated hematology controls for use in a variety of hematology instruments." ***Id.*** Streck states the patents-in-suit generally cover integrated controls having a reticulocyte component, hematology control compositions containing components for mimicking at least reticulocytes and white blood cells. Streck alleges R&D Systems and

Techne have made, used, and sold integrated hematology control products, including the CBC-XE and the CBC-4K Plus Retics.  *Id.* ¶ 7.

R&D Systems and Techne contest the validity of the patents-in-suit and deny infringing on them.  **See** Filing No. 14 - Answer.  R&D Systems also contends the asserted claims in the patents-in-suit are invalid, for a number of reasons.  *Id.*  R&D specifically argues the patents-in-suit are invalid under 35 U.S.C. § 102(g) because another invented the claimed subject matter first.

## ANALYSIS

**A.     Expert Witnesses**

On December 4, 2006, the parties filed a joint motion for protective order regarding confidential information.  **See** Filing No. 24.  On December 5, 2006, the court entered the protective order.  **See** Filing No. 25.  The protective order listed qualified persons who shall be the only persons to have access to any confidential information related to this case.  **See** *id.* ¶ 5(a).  The protective order specifically addresses expert witnesses by providing:

> ***Independent experts and consultants*** *retained in this action by the outside attorneys of record, in so far as the outside attorneys of record may deem it necessary for the preparation or trial of this case to consult with such experts or consultants,* ***provided that any such actual or contemplated expert or consultant is not employed by any of the Parties hereto or their respective counsel, and the conditions set forth in SECTION 7 are fulfilled in relation to any such actual or contemplated expert or consultant***.

*Id.* ¶ 5(a)(3) (emphasis added).

Disclosure to expert witnesses is further limited by requiring the expert to sign an agreement to be bound by the protective order, stating:

> Each independent expert and consultant referred to in SECTION 5(a)(3) to whom CONFIDENTIAL INFORMATION is to be given, shown, disclosed, made available or communicated in any way, shall first execute a declaration, in substantially the form attached here to as **EXHIBIT A**, agreeing to be bound by the terms of this Protective Order.

2

*Id.* ¶ 7(a).  Finally, a party may not make disclosures to an expert unless such expert is disclosed to the opposing party, giving the opposing party an opportunity to object.  *Id.* ¶ 7(b)-(c).

An order protecting disclosure or discovery is granted only upon a showing of good cause, including "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  **See** Fed. R. Civ. P. 26(c)(1)(G).  When determining the level of protection to afford particular information a court "must be guided by the liberal federal principles favoring disclosure, keeping in mind the need to safeguard confidential information transmitted within the discovery process from disclosures harmful to business interests."  **BASF Corp. v. United States**, 321 F. Supp. 2d 1373, 1378 (Ct. Int'l Trade 2004) (citation omitted).  "Courts dress technical information with a heavy cloak of judicial protection because of the threat of serious economic injury to the discloser of scientific information."  **Andrx Pharms., LLC v. GlaxoSmithKline, PLC**, 236 F.R.D. 583, 586 (S.D. Fla. 2006) (**quoting** *Safe Flight Instr. Corp. v. Sundstrand Data Control Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988)).  "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  **Seattle Times Co. v. Rhinehart**, 467 U.S. 20, 36 (1984); **Roberts v. Shawnee Mission Ford, Inc.**, 352 F.3d 358, 362 (8th Cir. 2003).

> Where parties to a lawsuit are commercial competitors, and one of them moves for protection against misuse of its confidential technical information, the court must balance the risk to the moving party of inadvertent disclosure against the risk that the protective order will impair the prosecution or defense of the other party's claims.

*Andrx Pharms.*, 236 F.R.D. at 585; **accord** *Nellson N. Operating, Inc. v. Elan Nutrition*, LLC, 238 F.R.D. 544, 546 (D. Vt. 2006) (To resolve a dispute over disclosure of confidential information to experts, courts "balance the movant's interest in selecting the consultant most beneficial to the case, . . . against the disclosing party's interest in protecting confidential commercial information from disclosure to competitors.") (**quoting** *BASF Corp.*, 321 F. Supp. 2d at 1378).

### *1.   Streck's motion to exclude Dr. Simson*

In support of Streck, Inc.'s Expedited Motion For An Order That Disclosure Not Be Made To Dr. Elkin Simson As An Expert Under The Protective Order (Filing No. 46), the plaintiff filed a brief (Filing No. 47) and an index of evidence (Filing No. 48). The defendants filed a brief (Filing No. 52) and an index of evidence (Filing No. 53) in opposition to the plaintiff's motion. The plaintiff filed a brief (Filing No. 54) and an index of evidence (Filing No. 56) in reply.

The plaintiff objects under the current protective order to the disclosure of confidential information to Dr. Elkin Simson, a technical expert proposed by the defendants. The plaintiff contends Dr. Simson should be excluded because Dr. Simson is currently employed as a consultant in the area of hematology controls by Beckman Coulter, Inc. (Beckman Coulter), one of the plaintiff's largest competitors in the hematology field. **See** Filing No. 46. The plaintiff also contends Beckman Coulter is an adverse party in a pending interference proceeding before the United States Patent and Trademark Office (PTO) regarding hematology controls, the subject matter of the present case before this court. *Id*. The plaintiff claims there is a possibility of confidential information finding its way to Beckman Coulter. *Id*. The plaintiff states Beckman Coulter is currently attempting to develop reticulocyte containing hematology controls. **See** Filing No. 54 - Reply p. 3. The plaintiff argues the damage which could result if disclosure to Dr. Simson is made outweighs any possible prejudice to the defendants by having to retain a new expert. Additionally, the plaintiff argues the direct competition between the plaintiff and Beckman Coulter has led to a previous patent infringement lawsuit, in which the court concluded Beckman Coulter was infringing on a number of the plaintiff's patents.[1] **See** Filing No. 47 - Brief p. 5-6. Finally, the plaintiff argues the defendants will suffer no prejudice if they are required to employ a different expert as no confidential documents have been passed to Dr. Simson and time remains to employ an expert in this action. **See** Filing No. 54 - Reply p. 5.

The defendants argue the protective order does not provide a basis to exclude Dr. Simson because he is not an employee of either of the parties or their counsel. **See** Filing

---

[1] ***Streck Labs., Inc. v. Beckman Coulter, et al.***, 8:99CV473, judgment entered November 13, 2002.

4

No. 52. The defendants contend Dr. Simson was properly disclosed under the protective order and signed the confidentiality agreement. The defendants object to the plaintiff unilaterally adding restrictions into the protective order, which were not agreed to by the parties. Additionally, the defendants argue Dr. Simson does not consult with Beckman Coulter on the development of hematology instrument controls or in the narrow area of integrated reticulocyte controls which is involved in this litigation. *Id.*; Filing No. 53 Ex. 1(D) - Dr. Simson Depo. pp. 31-32. The defendants assert any restriction on using consultants from the general field would effectively preclude the use of experts at all. Furthermore, the defendants claim neither the current interference proceedings nor the prior litigation between the plaintiff and Beckman Coulter relate to the patented technology involved in this dispute or include the involvement of Dr. Simson. **See** Filing No. 52, Brief pp. 4-6. Finally, Dr. Simson declared he "will not use or disclose to anyone any of the contents of any confidential information" in violation of the protection order. *Id.* p. 2 (**quoting** Exhibit A of protective order).

There is no doubt Dr. Simson is independent as contemplated by paragraph 5(a)(3) of the protective order. Dr. Simson is not employed by any of the parties or their counsel. Contrary to the defendants' argument, the protective order does not preclude all other challenges to disclosure of confidential materials to a proposed expert. However, Streck's motion seeking to exclude Dr. Simson, if granted, would be a modification of the current protection order in as much as Dr. Simson is not otherwise excludable under the plain language of paragraph 5(a)(3). Under the circumstances of this case and the filings before the court, there is no doubt the information is justifiably protected under the stipulated protective order. In determining the amount of protection warranted, the court will balance the interests of the parties, taking into particular consideration Streck's justification for additional protections beyond the current protective order.

Streck has the burden of showing a risk of inadvertent disclosure. **See *U.S. Gypsum v. LaFarge N. Am., Inc.***, No. 03C6027, 2004 WL 816770, at *1 (N.D. Ill. Mar. 2, 2004) (burden to show risk of suffering an unfair competitive disadvantage). Streck contends Dr. Simson should be excluded because experts engaged in active consultancy with a direct competitor may be excluded due to the risk of disclosure. Streck relies on ***BASF Corp.*** and ***Wang***. In ***BASF Corp.***, the protective order specifically excluded such

experts and the courts found the proposed expert's involvement in the lawsuit would be too difficult to separate from the ongoing consultancy undertaken with the competitor. **See BASF Corp.**, 321 F. Supp. 2d at 1379-81. In *Wang*, the proposed expert was excluded because he had worked for the opposing party on the technology related to the patent-in-suit. ***Wang Labs.,Inc. v. CFR Assocs., Inc.***, 125 F.R.D. 10 (D. Mass. 1989). The court does not find these cases to be on point. However, **BASF Corp.**, notes a "party cannot rely solely upon conclusory statements, but must present evidence of specific damage likely to result. . . ." **BASF Corp.**, 321 F. Supp. 2d at 1379 (internal quotations omitted).

The court finds the risk of inadvertent disclosure is very small. Dr. Simson has agreed to be bound by the protective order. Dr. Simson does not work for a party. The evidence before the court indicates Dr. Simson has an ongoing relationship with the plaintiff's competitor, Beckman Coulter. Dr. Simson stated "Coulter has asked me to provide to them as they work on their development process medical input and laboratory user input into the kind of performance that is required to service the needs of hematology laboratories and clinicians using hematology laboratory results." **See** Filing No. 53 Ex. 1(D) - Dr. Simson Depo. p. 5. Dr. Simson's consultation activities, although for a competitor, do not fall within the topic area covered by the patents-in-suit. The evidence before the court shows Dr. Simson's relationship with Beckman Coulter does not relate to the area of hematology controls. When evaluating Dr. Simson's actual activity and relationship to the competitor it appears Dr. Simson will not have difficulty keeping separate the information he may learn in this case from his consulting arrangement. Streck's past or ongoing legal actions involving Beckman Coulter are not relevant, as there is no showing Dr. Simson is in any way involved in those proceedings. Accordingly, Streck has failed to show good cause for additional protection of the confidential information beyond the present protective order or that it would risk competitive disadvantage by disclosure to Dr. Simson. Streck's motion to exclude will be denied.

### 2.    *The defendants' motion to exclude Dr. Langley*

In support of the defendants' Motion to Withdraw Dr. Langley's Access Under the Protective Order (Filing No. 59), they have filed a brief (Filing No. 60), a reply brief (Filing No. 65), and an index of evidence (Filing No. 61). The plaintiff filed a brief (Filing No. 63)

and an index of evidence (Filing No. 64) in opposition to the defendants' motion to withdraw access.

The defendants argue the court should withdraw access to information protected by the protective order to Dr. Robert Langley. Dr. Langley was initially disclosed in December 2006 by Streck. However, the defendants state that during a deposition on September 17, 2007, Dr. Langley revealed he is "intimately involved in Streck's development of blood control products, including those directly at issue in this litigation." **See** Filing No. 60 - Brief p. 1. Based on Dr. Langley's relationship to Streck, the defendants contend he cannot serve as an independent expert under the express language of the protective order. In response, Streck contends the defendants' objection to disclosure of information to Dr. Langley is untimely under the protective order. Further, Streck argues Dr. Langley's relationship to Streck, as part of his position at Bayer/Seimens, does not disqualify him under the protective order.

### i.     Timliness

The protective order provides specific time periods for disclosure of independent expert credentials and for objections to disclosure of confidential information for those expert witnesses. In relevant part,

> b.     At least ten (10) business days prior to the receiving Party giving, showing, disclosing, making available or communicating CONFIDENTIAL INFORMATION to any expert or consultant, the receiving Party shall deliver to all other Parties a copy of the declaration (EXHIBIT A) signed by the person to whom CONFIDENTIAL INFORMATION is proposed to be disclosed, and a writing setting forth the person's (i) name, (ii) residence and office address, (iii) present employer and job description, (iv) a general description of consulting activities, (v) any relationship to the Parties to this action, and (vi) a brief job history for the past three years if the person's current employment has been for less than three years.
> c.     **Any other Party shall be entitled to object to such disclosure to the expert or consultant within nine (9) business days after service of the declaration** by stating specifically in writing the reasons why that Party believes such person should not receive CONFIDENTIAL INFORMATION.

**See** Filing No. 25 - Protective Order ¶ 7 (emphasis added).

Streck initially disclosed Dr. Langley on December 18, 2006. In the December 18, 2006 disclosure Dr. Langley's curriculum vitae indicated he was "[r]esponsible for the management of all business and technical interactions with hematology OEM suppliers" in his position as Senior OEM Manager at Bayer. **See** Filing No. 61-4 Ex. B p. 2.[2] It goes on to state Dr. Langley does "[m]anage OEM new product development projects." *Id.* Further, in the Declaration Regarding Receipt of Confidential Information, a handwritten notation states, Dr. Langley is "business manager for Bayer Diagnostics for all interactions with Streck." *Id.* p. 5.

On July 26, 2007, Streck submitted a Declaration of Dr. Langley in an interference proceeding before the PTO (Johnson interference proceeding). The July 26, 2007 declaration stated that effective April 2007, Dr. Langley was the "Director of engineering in the Instrument Systems division with the primary responsibility of developing new hematology instruments." **See** Filing No. 61-5 Ex. C - Dr. Langley Decl. ¶¶ 3, 10. Dr. Langley also explained that "Streck does have an agreement with Bayer (Siemens) under which Streck supplies control material for instruments made by Bayer." *Id.* at ¶ 12. A deposition of Dr. Langley was taken in connection with the Johnson interference proceeding on September 17, 2007. During the deposition Dr. Langley described the nature of his interactions with Streck employees with some detail. Specifically, the deposition testimony is, in part:

> Q: And I just want to understand the role that you played on behalf of Siemens and he [Dr. Ryan] played on behalf of Streck.
> You were developing and manufacturing ultimately hematology analyzers; is that right?
> A: That's right.
> Q: Okay. And Streck and Dr. Ryan were developing and either OEMing or manufacturing or selling the controls for those analyzers; is that right?

---

[2] Streck explains,
> OEM stands for "Original Equipment Manufacturer". Under this type of agreement, one company, such as Streck makes a product that will be labeled under another company's label. For example, Streck makes controls for Bayer instruments, but rather than labeling the product with the Streck label, the product is labeled with a Bayer label. This type of arrangement is often used in the hematology control industry.

**See** Filing No. 63 - Brief p. 2 n.1.

8

> A: Yeah, we would – we would provide the specifications, and Dr. Ryan would try to make a control to fit that as we needed it. We would get the control material, review it, analyze it, decide whether it was appropriate for the instrumentation. I would give him critical feedback on what technically was not right with the control product. And then he would go back and try to iterate that control to make it work as we were developing the analyzer.

**See** Filing No. 61-6 Ex. D - Dr. Langley Depo. p. 20, lines 3-20.

Additionally, Dr. Langley explains his work with Streck employees was a "collaborative effort in that [Streck] needed our expertise with the methods and the development, . . . [it] would be working blind without us giving him technical input as to how the algorithms work, how the chemistry interacts with the cells, et cetera." *Id.* p. 20-22. Finally, while the instrument was Bayer's and the control product was Streck's, "ultimately [Dr. Langley] would be making the decision whether the control product was appropriate enough for the technology and whether it met our requirements for control and calibration of the instrument." *Id.* p. 22.[3]

The defendants state they did not learn the true nature of Dr. Langley's relationship with Streck until September 24, 2007, when reviewing the September 17, 2007 deposition. Further, the defendants argue they could not have objected to the use of Dr. Langley as an expert any earlier than they did because Streck failed to provide accurate or updated information in this case. The defendants state their reading of the initial disclosure was that ***generally*** Dr. Langley provided "management of all business and technical interactions with hematology OEM suppliers" but was ***only*** "business manager for Bayer Diagnostics for all interactions with Streck." In other words, the defendants' understanding was that Dr. Langley did not provide management of technical interactions with regard to Streck. The defendants contend it was Streck's burden to fully and accurately disclose the proposed expert's relationship with the party, which Streck failed to do. Further, the defendants contend Streck was, at a minimum, required to update Dr. Langley's disclosure when Streck became aware of the change in Dr. Langley's employment.

---

[3] The court has reviewed the portions of Dr. Langley's transcript which were cited by the parties, although it is not fully reprinted here.

Streck counters the defendants failed to object to Dr. Langley until Streck objected to the defendants' use of Dr. Simson. Streck contends the objection is untimely under the express terms of the protective order. Further, Streck argues that if the defendants were confused about the disclosures they should have asked for clarification earlier. Streck states that, in any event, Streck made the defendants aware of Dr. Langley's technical involvement in December of 2006, the nature of the involvement was the same as reflected in the deposition testimony. Streck also explains the nature of Dr. Langley's job at Bayer has shifted to developing new hematology analyzers and away from interacting with OEM control suppliers, including Streck. **See** Filing No. 63 - Brief p. 8-9. Streck contends there is no legitimate reason to relieve the defendants of the strict deadlines in the stipulated order. Finally, Streck states Dr. Langley has already provided expert consultation based on the confidential disclosures at issue, because the defendants did not previously object.

The court finds the defendants' objection to Dr. Langley is timely. The information provided to the defendants in December 2006 does not appear intentionally misleading or inadequate. However, the more detailed information received by the defendants later on may have made a difference in how the defendants responded initially. The defendants' interpretation of the December 2006 was not unreasonable. Additionally, even though there may be counsel for the defendants also working on the interference action, Streck has a duty in this case to make sure all disclosures are accurate and complete. **See** Fed. R. Civ. P. 26(e). Under the circumstances here, the court finds the defendants were not required to object to Dr. Langley's receipt of confidential information any sooner than they did.

### ii. Dr. Langley's relationship to Streck

Dr. Langley is not employed by a party. The defendants contend Dr. Langley's employment with Bayer is such that "he plays an essential role in Streck's development." **See** Filing No. 60 - Brief p. 4. The defendants argue Dr. Langley plays a technical role at Bayer, more than a business role as he had earlier stated. *Id.* Specifically,

> Dr. Langley's knowledge of Defendants' blood control development and commercialization allows him to direct and critique Streck's blood control product development, inevitably making those products commercially stronger—at the expense

> of Defendants' competitive position and market share. Dr. Langley's access to Confidential Information under the Protective Order is very likely to cause Defendants serious competitive harm, and thus he should not be allowed access to Defendants' Confidential Information.

*Id.* p. 10.

For these reasons, the defendants argue Dr. Langley is not "independent" under the terms of the protective order. The defendants urge the court to determine Dr. Langley's independence by evaluating a four-factor test.

> Courts have utilized the following factors when determining whether an expert is independent under the terms of a protective order:
> (1) the individual's relationship to or status within the receiving party's business, (2) the individual's present involvement in the receiving party's competitive decisions, (3) the likelihood of the relationship continuing, and (4) the feasibility of separating either the knowledge gained or the individual from future endeavors.

***Biovail Labs. Int'l SRL v. Abrika, LLLP***, No. 04-61704, 2007 WL 788849, at * 2 (S.D. Fla. Mar. 14, 2007) (***quoting AG Fur Atherische Ole v. Gucci Am., Inc.***, No. 04Civ280, 2006 WL 838996, at *2 (S.D.N.Y. Mar. 28, 2006) (**citing BASF Corp.**, 321 F. Supp. 2d at 1380)).

The court need not use the four-factor test to determine whether Dr. Langley is independent under the protective order. The protective order excludes only employees of the parties. The defendants do not argue that Dr. Langley is "in effect" an employee of Streck and the facts do not bear out such an assertion. The four factors listed above do assist the court in determining whether the defendants have met their burden of showing exclusion of Dr. Langley is warranted.

Dr. Langley did have technical interactions with Streck employees regarding hematology controls. However, Dr. Langley is no longer working with Streck employees in the same capacity. Further, the evidence shows Dr. Langley's work with Streck employees was with regard to making Streck's product work with Bayer's products, rather than to improve Streck's products for the general competitive market. Finally, there is no evidence Dr. Langley is unable to separate any information he gains in this case from his

11

present employment.  Under the circumstances presented, the defendants have failed to show an appreciable risk of inadvertent disclosure which would result in an unfair competitive disadvantage to the defendants.  Accordingly, the defendants have failed to show good cause exists to increase the protections already afforded them under the protective order.  For these reasons, the defendants' motion to withdraw Dr. Langley's access will be denied.

### B.    Motion for Sanctions

In support of the defendants' Motion for Sanctions (Filing No. 69), they filed a brief (Filing No. 70), a reply brief (Filing No. 80), and two indexes of evidence (Filing Nos. 71 and 81).  In the motion for sanctions, the defendants contend the plaintiff has "used" documents produced in this case and marked as "Confidential-Outside Counsel Only" under the protective order in an interference proceeding before the PTC.  Specifically, the defendants argue the plaintiff sought disclosure of the protected documents to impeach a witness in the interference proceeding.  The plaintiff's interference proceeding counsel referred to the protected documents stating the documents were inconsistent with the witness testimony.[4]  The documents themselves were not produced or disclosed in that proceeding, but "used" to compel discovery.  Additionally, the defendants contend the plaintiffs used the protected documents when drafting a statement of facts in the interference proceeding.  The defendants argue the plaintiff sought the discovery in the interference proceeding only because of the knowledge gained through exposure to the protected documents in this case, which is an impermissible use.

---

[4] By way of example, during the interference proceeding the plaintiff's counsel explained "counsel has reason to believe that, based on documents produced by [the defendants] in the Nebraska limitation, Mr. Veronneau is mistaken."  **See** Filing No. 71 Ex. 1(O) PTO Brief p. 7.  Further, in an order describing the dispute during the interference proceeding the PTO stated,
> According to [Streck's counsel], it is aware of the existence of documentation showing the production procedures for Ret-I and Ret-M because the parties are involved in ongoing litigation where the documentation has surfaced.  However, [Streck's counsel] states that it is not free to use the documentation in the present proceeding due to a court order in the ongoing litigation.

**See** Filing No. 71, Ex. 1(N) - PTO Order p. 2.

The plaintiff denies any violation of the protective order. The plaintiff filed a brief (Filing No. 78) and an index of evidence (Filing No. 79) in opposition to the defendants' motion for sanctions. The plaintiff explains it recognized a witness's statements were summary conclusions and inconsistent with Streck's own independent investigation of the defendants' products and in comparison to how Streck had been told the products were manufactured. Streck sought the information necessary to confirm or impeach the witness's statements, including manufacturing documents. Streck argues it did not use or refer to the protected documents while it sought discovery or drafted the statement of facts. However, Streck did list particular documents sought for re-designation at the request of the defendants' counsel.

Here it is clear the parties conferred about disclosure of the documents at issue prior to filing the motions. Streck sought permission from the defendants to change the designation of the documents, which the defendants refused. Additionally, Streck sought independent discovery of the documents through the interference proceeding. Such discovery was denied.

The defendants have the "burden of proving the alleged contempt and demonstrating it by clear and convincing evidence." **N. L. R. B. v. Ralph Printing & Lithographing Co.**, 433 F.2d 1058, 1062 (8th Cir. 1970). "No one should be held in contempt for violating an ambiguous order, . . . . A contempt should be clear and certain." **Imageware, Inc. v. U.S. West Commc'ns**, 219 F.3d 793, 797 (8th Cir. 2000) (**citing *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n***, 389 U.S. 64, 76 (1967); **Project B.A.S.I.C. v. Kemp**, 947 F.2d 11, 16 (1st Cir. 1991) ("civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous")).

The issue before the court now is whether the plaintiff's reliance, if any, on the protected documents disclosed in this case when pursuing disclosure of the same documents in the interference proceeding constitutes a violation of the protective order. The protective order in this case states: "CONFIDENTIAL INFORMATION disclosed pursuant to this Protective Order shall be used only for purposes of the above captioned litigation and shall be protected from any unauthorized or unrelated use." **See** Filing No. 25 - Protective Order p. 9. The Protective Order further allows the parties to designate certain documents as "Confidential-Outside Counsel Only." *Id.* at 3.

The defendants contend use for any purpose is a violation of the protective order. The defendants cite **On Command Video Corp. v. LodgeNet Entm't Corp.**, 976 F. Supp. 917, 920-22 (N.D. Cal. 1997). In **On Command** the plaintiff was found in contempt for using documents received under a protective order in a federal proceeding. The plaintiff "used" the documents to file a state court lawsuit. In that case the protective order "unequivocally bars *all* uses of confidential materials *except* one–'[the] analysis of issues presented in *this* litigation.'" **On Command**, 976 F. Supp. at 921 (emphasis and alteration in original) (quoting protective order). The **On Command** court also relied on the purpose of the protective order, in addition to the plain language.

The plaintiff relies on **Hu-Friedy Mfg. Co., Inc. v. General Elec. Co.**, No. 99C0762, 1999 WL 528545 (N.D. Ill. July 19, 1999). In **Hu-Friedy**, counsel who participated in one lawsuit also participated in a later lawsuit against a related defendant. The defendant argued such participation lead to unfair advantage because counsel had seen confidential materials which could not be used in the later lawsuit. The **Hu-Friedy** court determined any contention the plaintiff's counsel used the confidential materials to file the second lawsuit was speculative, as well as flatly denied by counsel. Further, the **Hu-Friedy** court stated the defendant's reading of the word "use" was strained.

Here, the court concludes the defendants are also straining the term "use." The plaintiff's counsel's general reference to protected documents during the interference proceeding is insufficient under these circumstances to constitute a violation of the protective order. Further, the plaintiff's counsel did not disclose any confidential information, which was not ascertainable, accurately or not, through an independent source. The plaintiff was not relying on the materials themselves, but attempting to secure their disclosure in the interference proceeding. In that sense, this case is more akin to **Hu-Friedy**, than to **On Command**. The action in the subsequent proceeding was not based on the disclosure of confidential materials. Additionally, the same action may have occurred without counsel's knowledge of the confidential materials, to assume otherwise would be speculative. Accordingly, the defendants' motion for sanctions will be denied.

### C. Motion to Compel

In support of the plaintiff's Motion to Compel Production of Documents Responsive to Streck's First and Second Sets of Requests for Production (Filing No. 66), the plaintiff filed a brief (Filing No. 67) and an index of evidence (Filing No. 68). The defendants filed a brief (Filing No. 74) and an index of evidence (Filing No. 75) in opposition to the motion to compel. The plaintiff filed a brief (Filing No. 76) and an index of evidence (Filing No. 77) in reply. The defendants then filed a Motion for Leave to File a Sur-Reply Brief in Opposition to Streck's Motion to Compel (Filing No. 82), with the attached proposed sur-reply, and a brief (Filing No. 83) in support of the motion for leave. The plaintiff filed a brief (Filing No. 84) in opposition to the motion for leave.

The plaintiff seeks an order compelling the defendants to produce documents responsive to the plaintiff's Request for Production Nos. 1-3, 13 and 21-46. The plaintiff states the defendants have agreed to the production, but later refused based on the plaintiff's use of Dr. Langley as an expert and reference to protected documents during the interference proceeding, discussed above. The plaintiff states it agreed not to produce the documents to Dr. Langley until resolution of the motion to withdraw (Filing No. 59), discussed above. The plaintiff contends the documents requested are clearly relevant because they relate to the timing and methods used for the defendants to invent the allegedly infringing products.

The defendants state they should not have to produce additional confidential documents until after the court resolves the current disputes between the parties. Additionally, the defendants contend, a subset of the requested documents are not relevant. Specifically, the defendants argue research and development documents relating to research conducted after the defendants applied for U.S. Patent Application 09/419,991 (the '991 application) on October 18, 1999, are not relevant. **See *Frazer v. Schlegel***, 498 F.3d 1283, 1288 (Fed. Cir. 2007) ("The filing of a patent application is a constructive reduction to practice of the invention disclosed therein.").

In response, the plaintiff argues that although R&D Systems claims to have invented the product first, R&D Systems did not apply for FDA approval or commercialize the product until late 2004. Based on the seeming incongruity of these facts, the plaintiff

believes the post-1999 documents will show that R&D Systems was unsuccessful in its efforts to invent a control until well after October 1999.  **See** Filing No. 76 - Reply p. 3. More specifically, the plaintiff believes the documents will show the method and procedure R&D Systems used and described in the '991 Application was not successful in making a control.  *Id.*  Therefore, the plaintiff contends the method described in the '991 Application which R&D Systems relies on for its "constructive reduction to practice" fails to meet the requirements under 35 U.S.C. § 112.  *Id.*  Thus R&D Systems cannot rely upon it as a constructive reduction to practice and the October 1999 date is meaningless as a discovery cut off date.  **See** *Frazer*, 498 F.3d at 1289 ("Based on the constructive reduction to practice of an invention whose disclosure is in compliance with the requirements of § 112, Frazer is entitled to the priority benefit of the [earlier] filing date.").  Over the plaintiff's objection, the court also considered the defendants' sur-reply arguments.

The plaintiff also contends the requested documents are relevant to R&D Systems' claim that the plaintiff's patents are invalid because they are obvious under 35 U.S.C. § 103.  "[S]econdary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.  As indicia of obviousness or nonobviousness, these inquiries may have relevancy."  ***Graham v. John Deere Co. of Kansas City***, 383 U.S. 1, 17-18 (1966); **see also** ***KSR Int'l Co. v. Teleflex Inc.***, 127 S. Ct. 1727, 1733-34 (2007).  Specifically, the plaintiff argues the issue of "failure of others" is a relevant consideration in this case.  The plaintiff asserts R&D Systems' documents may reflect R&D Systems was unable to successfully make a hematology control until four years after the plaintiff's control became available.  Based on the timing of the defendants' control, the plaintiff also alleges the requested documents may show whether any portion of the plaintiff's patent or products were copied. **See** ***Diversitech Corp. v. Century Steps, Inc.***, 850 F.2d 675, 679 (Fed. Cir. 1988) ("Copying is an indicium of nonobviousness, and is to be given proper weight."); **see also** ***Brown & Williamson Tobacco Corp. v. Philip Morris Inc.***, 229 F.3d 1120, 1129 (Fed. Cir. 2000) (listing factors and cases related to secondary indicators of nonobviousness).

Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings. Relevancy, for purposes of discovery, has been defined by the United States Supreme Court as encompassing "any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." ***Oppenheimer Fund, Inc. v. Sanders***, 437 U.S. 340, 351 (1978). Discovery requests should be considered relevant if there is any possibility that the information sought is relevant to any issue in the case and should ordinarily be allowed, unless it is clear that the information sought can have no possible bearing on the subject matter of the action. **See *Burlington Ins. Co. v. Okie Dokie, Inc.***, 368 F. Supp. 2d 83, 86 (D. D.C. 2005). Typically, the burden is on the party resisting discovery to explain why discovery should be limited given that the Federal Rules allow for broad discovery. **See *Rubin v. Islamic Republic of Iran***, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004). However, the proponent of discovery must make a threshold showing of relevance before production of information, which does not reasonably bear on the issues in the case, is required. ***Hofer v. Mack Trucks, Inc.***, 981 F.2d 377, 380 (8th Cir. 1993).

The court will not, at this time, determine such issues as whether R&D Systems' patent application contained information sufficient to meet the requirements of 35 U.S.C. § 112 or whether the plaintiff is limited to comparison of R&D Systems' patent application, as opposed to the actual later products. The evidence and arguments before the court make it clear the plaintiff has met its burden of showing the documents sought could bear on issues that are or may be in the case. In ***Frazer*** court noted the inventor's later discovery "does not negate or contradict his disclosure and constructive reduction to practice." ***Frazer***, 498 F.3d at 1288. However such comments were made based on review of the documents, not in an attempt to preclude disclosure. Further, the defendants fail to show principled justification for narrowing the requests or for refusal to permit the discovery sought on the basis of relevance, or for any other reason. Accordingly, the plaintiff's motion to compel will be granted.

In consideration of the totality of the circumstances and all of the motions resolved in this order, no party will be awarded attorney fees or other sanctions pursuant to Federal Rule of Civil Procedure 37. Upon consideration,

**IT IS ORDERED:**

1. The plaintiff's Expedited Motion For An Order That Disclosure Not Be Made To Dr. Elkin Simson As An Expert Under The Protective Order (Filing No. 46) is denied.

2. The defendants' Motion to Withdraw Dr. Langley's Access Under the Protective Order (Filing No. 59) is denied.

3. The defendants' Motion for Sanctions (Filing No. 69) is denied.

4. The plaintiff's Motion to Compel Production of Documents Responsive to Streck's First and Second Sets of Requests for Production (Filing No. 66) is granted.

5. The defendants shall have to **on or before until March 17, 2008**, to produce the requested materials.

6. The defendant's Motion for Leave to File a Sur-Reply Brief in Opposition to Streck's Motion to Compel (Filing No. 82) is granted.

7. The court will hold a telephone conference **on March 3, 2008, at 1:45 p.m.,** with counsel for the parties to reschedule the *Markman* hearing. Counsel for the plaintiff shall initiate the conference.

**ADMONITION**

Pursuant to NECivR 72.2 any appeal of this Order shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Order. Failure to timely appeal may constitute a waiver of any objection to the Order. The brief in support of any appeal shall be filed at the time of filing such appeal. Failure to file a brief in support of any appeal may be deemed an abandonment of the appeal.

DATED this 26th day of February, 2008.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge